1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ELLWOOD GLOSSBRENNER,

               Plaintiff,

     v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

               Defendant.

CASE NO.     C04-5489FDB

REPORT AND
RECOMMENDATION

Noted for June 24, 2005

Plaintiff, Ellwood Glossbrenner, has brought this matter for judicial review of the denial of his application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on July 21, 1964. Tr. 67.  He has three years of college education and past work

experience as a care giver, file clerk, clothing picker, cook, assistant manager, carpenter, driver and packer. Tr. 22, 81, 86, 89.

On July 2, 2001, plaintiff filed an application for disability insurance benefits, alleging disability as of August 3, 2000, due to Gulf War Syndrome, chronic fatigue, posttraumatic stress disorder ("PTSD"), depression, neuro-muscular/brain damage, and exposure to uranium. Tr. 22, 66-69, 80. His application was denied initially and on reconsideration. Tr. 32-37, 40-42. Plaintiff requested a hearing, which was held on April 8, 2003, before an administrative law judge ("ALJ"). Tr. 368. At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert. Tr. 368-90.

On May 20, 2003, the ALJ issued a decision finding plaintiff not disabled. Tr. 30-31. Specifically, the ALJ found in relevant part as follows:

(1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" mental impairments consisting of depression and a personality disorder;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)    at step four, plaintiff had the residual functional capacity to perform work with certain non-exertional mental functional limitations, which did not preclude him from performing his past relevant work as a carpenter and care provider.

Tr. 29-30. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on April 22, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 10-12; 20 C.F.R. §§ 404.981.

On August 17, 2004, plaintiff filed a complaint in this court seeking review of the Commissioner's decision. (Dkt. #1). Specifically, plaintiff argues that decision should be reversed and remanded for further administrative proceedings for the following reasons:

(a)    the ALJ failed to properly consider the award of "individual unemployability" he received from the United States Department of Veterans Affairs ("VA");

(b)    the ALJ erred in failing to find plaintiff's somatoform disorder and migraine headaches to be "severe" impairments;

(c)    the ALJ erred in assessing plaintiff's credibility;

(d)    the ALJ erred in assessing the credibility of plaintiff's mother;

(e)    the ALJ erred in assessing plaintiff's residual functional capacity;

(f)    the ALJ erred in finding plaintiff could perform his past relevant work based on

1  his residual functional capacity; and

2  (g)  the ALJ erred in failing to call a vocational expert at step five of the disability
      evaluation process in light of plaintiff's non-exertional impairments.

Plaintiff further argues that on remand, in addition to obtaining vocational expert testimony regarding his

ability to perform other jobs existing in significant numbers in the national economy, the testimony of a

mental health medical expert should be obtained concerning whether his mental impairments meet or equal

any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the

Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

one rational interpretation, the court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d

577, 579 (9th Cir. 1984).

I.  The ALJ Properly Considered the VA's Award of "Individual Unemployability"

Plaintiff argues the ALJ failed to properly consider the award of "individual unemployability" he

received from the VA.  Based on a rating decision issued by the VA in late March 2000 (Tr. 235-37),

plaintiff was found by the VA in early May 2000, to be thirty percent disabled due to major depression and

fifty percent disabled due to migraine headaches (Tr. 234).  His "overall or *combined*" disability rating was

set at seventy percent. Tr. 234 (emphasis in the original).  In mid-June 2002, the VA granted plaintiff

entitlement to one hundred percent "individual unemployability" effective April 30, 2001, because of his

inability to work due to his service-connected disabilities. Tr. 61, 63.

With respect to the above two VA rating and individual unemployability decisions, the ALJ found as

follows:

In May 2000 the Department [of] Veterans Affairs the [sic] found that the claimant was
50 percent disabled due to his migraines and 30 percent disabled due to his depression
effective January 27, 1995 (Exhibit 6F).  However, the claimant was employed at the

time of this finding of disability by the VA, and he continued to work until August 3, 2000, which is his alleged onset date (Exhibit 1E/2). . . .

In June 2002 the VA denied the claimant benefits on a posttraumatic stress disorder but entitlement to individual employability was granted effective April 30, 2001 (Exhibit 10B). The concept of individual unemployability does not equate to the social security disability test and this determination is not binding on me. I accord it little weight in light of the level of disability previously accorded the claimant while he was still working.

Tr. 24-25. Plaintiff argues the ALJ erred by not according the VA's June 2002 award of individual unemployability "great weight." Specifically, plaintiff asserts the ALJ erred in stating the VA's definition of "individual unemployability" does not equate with the Social Security Administration's definition of "disability." Plaintiff further asserts the VA's prior rating decision, which was completed during a time he was employed, has no relevance to the VA's later award of individual unemployability, which was made for a period during which he was not working and unable to work.

Both of plaintiff's arguments, however, are unpersuasive, and the undersigned finds the ALJ did not err in giving less weight to the VA's award of individual unemployability. Although a determination by the VA about whether a claimant is disabled is not binding on the Social Security Administration, an ALJ must consider that determination in reaching his or her decision. McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002); 20 C.F.R. § 404.1504. Further, the ALJ "must ordinarily give great weight to a VA determination of disability." McCartey, 298 F.3d at 1076. This is because of "the marked similarity" between the two federal disability programs:

Both programs serve the same governmental purpose--providing benefits to those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . . Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework.

Id. However, "[b]ecause the VA and SSA criteria for determining disability are not identical," the ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001). Here, the ALJ did so.

As the Ninth Circuit in McCartey noted, "a VA rating of disability does not necessarily compel the

[Social Security Administration] to reach an identical result." Id. (citing 20 C.F.R. § 404.1504).  Section

404.1504 of the Social Security Administration's regulations provides in relevant part:

> A decision by . . . any other governmental agency about whether you are disabled . . . is
> based on its rules and is not our decision about whether you are disabled . . . We must
> make a disability . . . determination based on social security law. Therefore, a
> determination made by another agency that you are disabled . . . is not binding on us.

20 C.F.R. § 404.1504.  Thus, because, as discussed above, "the criteria applied by the two agencies" are not

identical, "[a] VA rating of total and permanent disability is not legally binding on the Commissioner."

Chambliss, 269 F.3d at 522.

Plaintiff relies on language contained in 38 C.F.R. § 4.16(a) and (b) to support his argument that the

term "individual unemployability" as defined by the VA equates to "disability" as that term is used in the

social security context.  That language references the term "substantially gainful occupation" and reads in

relevant part as follows:

> (a) Total disability ratings for compensation may be assigned, where the scheduler rating
> is less than total, when the disabled person is, in the judgment of the rating agency,
> unable to secure or follow a substantially gainful occupation as a result of
> service-connected disabilities

> (b) It is the established policy of the Department of Veterans Affairs that all veterans
> who are unable to secure and follow a substantially gainful occupation by reason of
> service-connected disabilities shall be rated totally disabled.

38 C.F.R. § 4.16.[1]  The VA regulations concerning disability ratings do not define "substantially gainful

occupation."  Thus, it is not at all clear "substantially gainful occupation" has the meaning "substantial

gainful activity" does in the social security disability context.[2]

The term  "disability" is defined in the Social Security Act to mean the inability to "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The VA regulations concerning disability ratings provide

---

[1]Plaintiff also quotes language from 20 C.F.R. § 4.16 that is different from that quoted above. See Plaintiff's Opening Brief, p. 10.  The quote plaintiff includes in his opening brief, however, could not be found in the most recent version of 38 C.F.R. § 4.16. See 38 C.F.R. § 4.16 (West 2005).

[2]In contrast,  "substantial gainful activity" is defined "as work that 'involves doing significant physical or mental activities' and 'is the kind of work usually done for pay or profit.'" Soria v. Callahan, 16 F. Supp.2d 1145, 1149 (C.D. Cal. 1997) (quoting 20 C.F.R. § 416.972(a), (b)).  Work may be substantial "even if it is done on a part-time basis.'" Id. (quoting Byington v. Chater, 76 F.3d 246, 250 (9th Cir. 1996)). It is gainful "if it is the kind of work usually done for pay or profit, whether or not a profit is realized." Id. at 1150 (quoting 20 C.F.R. §§ 404.1572(b), 416.972(b)).

1   that an individual will be considered "unemployable" under the following circumstances:

2       [U]pon termination of employment which was provided on account of disability, or in
        which special consideration was given on account of the same, when it is satisfactorily
3       shown that he or she is unable to secure further employment.

4   38 C.F.R. § 4.18 (emphasis added).  Thus, it appears that, unlike in the social security context, an individual

5   may be deemed "unemployable" if he or she cannot find employment.[3]  See 20 C.F.R. § 404.1566(a) (work

6   exists in national economy for step five disability evaluation purposes when it exists in the region where

7   claimant lives or in several other regions, regardless of whether it exists in claimant's immediate area, there

8   are specific job vacancies open, or claimant would be hired if he or she applied).

9       Similarly, the VA regulations concerning disability ratings also state that "[t]otal disability ratings for

10  compensation may be assigned" if the "disabled person is . . . unable to secure or follow a substantially

11  gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a) (emphasis added); see

12  also 38 C.F.R. § 4.16(b) ("[A]ll veterans who are unable to secure and follow a substantially gainful

13  occupation by reason of service-connected disabilities shall be rated totally disabled.") (emphasis added).  In

14  addition, those regulations provide that the disability rating:

15      is based primarily upon the average impairment in earning capacity, that is, upon the
        economic or industrial handicap which must be overcome and not from individual
16      success in overcoming it.

17  38 C.F.R. § 4.15 (emphasis added).  "Total disability," furthermore, "will be considered to exist when there

18  is present any impairment of mind or body which is sufficient to render it impossible for the average person

19  to follow a substantially gainful occupation."[4]  Id.  On the other hand, a determination of disability in the

20  social security context clearly requires that the individual claimant be unable work based on his or her

21  medically determinable impairments. See, e.g., 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520.

22      The ALJ also properly discounted the June 2002 award of individual unemployability because of

23  "the level of disability previously accorded the claimant [by the VA] while he was still working." Tr. 25.  In

24  granting plaintiff individual unemployability in late June 2002, the VA specifically referenced its prior rating

25  _____

26      [3]This is borne out by the actual language used by the VA in finding plaintiff to be entitled to individual unemployability
    in June 2002: "Entitlement to individual unemployability is granted because the claimant is unable to secure or follow a
27  substantially gainful occupation as a result of service-connected disabilities." Tr. 61.

28      [4]Again, the VA's June 2002 ratings decision states: "We believe the average person, with education and work experience
    and service-connected disabilities similar to this claimant, would be generally unemployable in most occupations." Tr. 61.

1    decisions:

2          A review of Mr. Glossbrenner's claims folder indicates he is currently evaluated at 70
           percent disabling with one disability evaluated at 50 percent. Therefore, he meets the
3          eligibility criteria for individual unemployability.

4    Tr. 61. As noted by the ALJ, plaintiff was employed at the time of those prior rating decisions (March and

5    May 2000), and he continued to work until August 3, 2000. Tr. 22, 80-81, 234-37. Indeed, the June 2002

6    rating decision and award of individual unemployability thus appear to be based on prior rating decisions

7    that were made at a time during which plaintiff has not claimed he was disabled.

8    II.    The ALJ Properly Did Not Find Plaintiff's Somatoform Disorder and Migraine Headaches Severe

9          To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

10   sequential evaluation process. 20 C.F.R. § 404.1520. At step two of this process, the ALJ must determine

11   if an impairment is "severe". Id. An impairment is "not severe" if it does not "significantly limit" a

12   claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a);

13   Social Security Ruling ("SSR") 96-3p. Basic work activities consist of those "abilities and aptitudes

14   necessary to do most jobs." 20 C.F.R. § 140.1521(b); SSR 85- 28; SSR 96-3p.

15         An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

16   than a minimal effect on an individual[']s ability to work." See SSR 85-28; Smolen v. Chater, 80 F.3d

17   1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden

18   of proving that her "impairments or their symptoms affect his ability to perform basic work activities."

19   Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir.

20   1998). Plaintiff will not be found disabled if he fails "to establish [he] had a severe impairment" on or

21   before his date last insured. Tidwell, 161 F.3d at 601.

22         Plaintiff argues the ALJ should have found his somatoform disorder and migraine headaches to be

23   severe impairments. First, with respect to his migraine headaches, plaintiff states the medical expert, Dr.

24   David Williams, "identified" them "as meeting the severity requirements" at step two of the disability

25   evaluation process. Plaintiff's Opening Brief, p. 16. However, Dr. Williams did not so testify. While Dr.

26   Williams did testify that plaintiff had "a history of recurrent headaches of severe nature compatible with the

27   diagnosis of migraine headache," he did not indicate that such headaches had any impact, significant or

28   otherwise, on plaintiff's ability to perform basic work activities. Tr. 385. In addition, while plaintiff was

REPORT AND RECOMMENDATION
Page - 7

1  thought to be "moderately impaired with his job" because of his migraine headaches in early December 1999

2  (Tr. 203), he subsequently reported in late 2001 and early 2002, improvement in those headaches to the

3  point where he felt them to be "reasonably controlled" and not "a big problem." Tr. 357, 361.

4         With respect to plaintiff's somatoform disorder, only one examining psychologist, Dr. Richard D.

5  Cornish, made that diagnose, and he did so because he "was unable to elicit any evidence" plaintiff had

6  PTSD, because a "definitive diagnosis" was "extremely difficult to make," and because it approximated

7  plaintiff's "condition closer than any other" Dr. Cornish had considered. Tr. 355.  Thus, the undersigned

8  cannot fault the ALJ for regarding Dr. Cornish's opinion "as a very grudging conclusion of somatoform

9  disorder." Tr. 29.  Plaintiff argues, however, that many of his "impairment-related limitations," including his

10  "diagnosed toxicity," met the severity requirements at step two of the disability evaluation process for

11  somatoform disorder. Plaintiff's Opening Brief, pp. 16-17.  Thus, plaintiff asserts, the ALJ should have

12  found his somatoform disorder to be severe, which would explain his fatigue and need to lie down, instead

13  of finding his alleged heavy metal toxicity to be a non-severe impairment.

14         The undersigned disagrees.  Should the court accept plaintiff's argument, it would require the ALJ

15  to substitute his opinion for that of the weight of the medical opinion evidence in the record.  This, the ALJ

16  may not do.  See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir.

17  1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary

18  of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own

19  judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ is not

20  free to set own expertise against that of physician who testified before him).  In other words, the ALJ would

21  not merely be choosing "between properly submitted medical opinions," as he would be free to do. Gober,

22  574 F.2d at 777.  Rather, the ALJ would be basing his decision on "his own expertise." See Whitney v.

23  Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of objective

24  medical findings without supporting medical expert testimony).

25         With respect to plaintiff's allegations of severe physical impairments, the ALJ found as follows:

26         After a review of the whole record, I find that the claimant has no severe physical
       impairments.  His alleged heavy metal toxicity is [a] non-severe impairment, as it does
27     not cause significant limitations in his ability to carry out basic work activity.  Dr.
       [Morris] Fuller at exhibit 13F and the impartial medical expert found that the heavy
28     metal toxicity was poorly supported by the claimant's laboratory findings.  The
       claimant's physical and neurological examinations in December 2001 were within normal

1
2

limits.  The claimant's musculoskeletal examination revealed full range of motion with no evidence of edema, joint deformities or joint swelling.  Reflexes and sensation were intact with no focal neurological deficit (Exhibit 16F/8).  Accordingly, I find that the claimant has no exertional limitations.

3
4
5

Tr. 28-29.  Plaintiff argues Dr. Fuller's opinion, Dr. Williams' testimony, and the normal neurological and physical examinations plaintiff had in December 2001, are all consistent with the diagnosis of somatoform disorder. As discussed above, however, the ALJ may not act as his own medical expert.  Indeed, in addition to Dr. Cornish, the record contains opinions from six other psychologists and psychiatrists, four of whom evaluated plaintiff in person and none of whom diagnosed him with a somatoform disorder.

6
7
8
9
10
11
12
13

The undersigned, furthermore, finds the weight of the medical evidence in the record supports the ALJ's determination that none of plaintiff's alleged physical impairments are severe.  In early January 1998, plaintiff's treating physician, Dr. Gregory S. Ames, saw plaintiff for the first time and diagnosed him initially with "Environmental Illness caused by Xenobiotic poisoning." Tr. 258.  Dr. Ames felt plaintiff's prognosis to be "poor with conventional therapy." Tr. 259.  He believed plaintiff might "eventually recover to good health or be partially or fully disabled his entire life." Id.

14
15
16
17
18
19
20
21

Dr. Ames continued to diagnose plaintiff with heavy metal and chemical toxicities and poisoning and resulting fatigue through late 2001 (Tr. 260, 263, 265-66, 268, 290, 339-40, 342-43).  However, in late April 1999, plaintiff was noted to be stable on "multiple naturopathic preparations." Tr. 238.  In early March 2001, Dr. Ames also found plaintiff to be stable and feeling better with treatment. Tr. 265-66.  In late July 2001, plaintiff himself reported "feeling much better" since starting treatment, and in October 2001, he noted a "slight increase in energy." Tr. 342-43.  In early December 2001, he again reported that his chronic fatigue and Gulf War Syndrome had "improved" on the medications and dietary supplements Dr. Ames had prescribed him. Tr. 361.

22
23
24
25
26
27
28

No other physician in the record found plaintiff to be suffering from heavy metal or other chemical toxicity or poisoning.  Dr. Morris Fuller, a non-examining physician who reviewed the medical record in mid-September 2001, found his allegations of chronic fatigue to be non-severe due to a lack of objective medical evidence to corroborate heavy metal poisoning or other causal factors. Tr. 296.  Dr. Williams, the medical expert, questioned the reliability and accuracy of plaintiff's heavy metal contamination test results, and he found no evidence that plaintiff's chronic fatigue met the Center for Disease Control's criteria for diagnosing chronic fatigue syndrome. Tr. 385, 387.

The reports of the other physicians in the record show a dearth of evidence supporting the presence of any other severe physical impairments.  In early December 1999, Dr. James Opara noted plaintiff was "symptom free" and "doing well" with respect to his reactive airway disease. Tr. 202.  In early January 2000, Dr. Opara found plaintiff's neurological examination to be within normal limits. Tr. 205.  Testing also revealed no evidence of a sleep-related breathing disorder. Tr. 205, 211.

III.   The Commissioner Is Not Required to Call a Medical Expert to Determine Whether Plaintiff Meets or Equals a Listed Mental Impairment

At step three of the disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Pt. 404, Subpt. P, App. 1. 20 C.F.R (the "Listings"). § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, the claimant is deemed disabled. Id.  The burden of proof is on the claimant to establish he meets or equals any of the impairments in the listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.  Further, an impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19.

For the reasons set forth below the undersigned recommends that this matter be remanded to the Commissioner for further administrative proceedings.  Plaintiff argues that on remand, a *de novo* hearing must be conducted at which a medical expert with expertise in mental health should testify as to whether he meets or equals one of the mental impairments in the Listings.  With respect to the step three analysis, the ALJ made the following findings, which read in relevant part:

> I have reviewed all of the evidence, including testimony, and conclude that the claimant's impairments, both singly and in combination, do not meet or equal the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 CFR, Part 404, Subpart P, Appendix 1).
>
> The claimant's depression, not otherwise specified has been evaluated under Listing 12.04 and his personality disorder by history under Listing 12.08.  However, I find that neither the "B" nor the "C" criteria have been met.  James Bailey, Ph.D., and Michael Brown, Ph.D., found that the claimant's mental impairments do not meet or equal the listings (Exhibit 9F, 11F).  The State Agency physician found that the claimant had no severe physical impairments (Exhibit 11E).

Tr. 26. Plaintiff has not challenged these findings. In addition, as discussed above, the ALJ did not err in finding plaintiff's physical impairments non-severe or in declining to find plaintiff's somatoform disorder severe. Accordingly, the Commissioner need not conduct any further step three analysis on remand.

IV.     The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part because there was "no underlying impairment to explain his extreme fatigue and a need to lie down during the day." Tr. 27. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). As discussed above, the ALJ properly found plaintiff had no severe physical impairments and properly declined to find his

1    somatoform disorder to be severe.  Thus, he also properly discounted plaintiff's symptom complaints for the

2    lack of any evidence of an underlying causal impairment.

3         The ALJ also discounted plaintiff's credibility in part because he was "not otherwise credible in

4    regards to his mental impairments," finding specifically in relevant part that:

5         The claimant indicated he has concentration and memory problems as well as difficulty
          retaining information (Exhibit 10E), but upon formal testing his memory capabilities
6         were within the normal functioning range. . . . He remembered three objects after five
          minutes and he demonstrated good functioning on the Trails A and B.  During his
7         mental status evaluation and testing, the claimant followed instructions and
          demonstrated average mental abilities (Exhibit 9F).

8    Tr. 27.  These findings are supported by the medical evidence in the record.

9         An evaluation of plaintiff performed by Lee C. Buch, Ph.D., in early January 1997, was essentially

10   normal. Tr. 200.  Specifically, Dr. Buch found plaintiff had no difficulty with attention or concentration.  Id.

11   While Dr. Buch's evaluation occurred two years prior to plaintiff's alleged onset date of disability, another

12   evaluation performed by Dr. Anotonio de la Maza in early December 1999, was substantially similar. Tr.

13   208.  Dr. de la Maza in particular noted that plaintiff was "competent and working."  Id.  In late January

14   2001, plaintiff discontinued therapy against the recommendation of his treating psychologist. Tr. 240.  A

15   memory assessment performed in late April 2001, indicated that plaintiff had no thought disorder and that

16   he had no disabling memory impairments. Tr. 257.  Plaintiff was able to follow instructions well, and he

17   demonstrated "average mental abilities."  Id.  Indeed, his global assessment of functioning score was rated at

18   between 70 and 80.  Id.

19        Neither of the non-examining physicians in the record found plaintiff to have any problems with his

20   memory, concentration or persistence.  James E. Bailey, Ph.D., found plaintiff had only mild difficulties in

21   maintaining concentration, persistence or pace. Tr. 251.  Michael Brown, Ph.D., felt plaintiff's allegations of

22   memory and concentration problems were not well-supported by the medical evidence in the record. Tr.

23   293.  Plaintiff's mental health therapist reported in February and March 2000, that plaintiff seemed stable

24   and "more positive." Tr. 229, 231.  In late April 2000, plaintiff told his therapist that he did "not feel a need

25   for further counseling." Tr. 232.

26        The ALJ also discounted plaintiff's credibility for the following reasons:

27        The record indicates that the claimant's allegedly disabling impairments of migraines and
          metal toxicity were present at approximately the same level of severity prior to the
28        alleged onset date.  The fact that the impairment did not prevent the claimant from

working at that time strongly suggests that it would not currently prevent work.  In fact, a regional manager of Walsh & Associates, where the claimant was employed, reported that the claimant met the normal requirements.  He had good attendance and was punctual, and it wasn't until the claimant admitted to a felony conviction that he was terminated (Exhibit 9E). . . . As mentioned earlier, the record reflects work activity after the alleged onset date, which indicates a level of vigor and stamina inconsistent with disability. . . . Claimant's representation at the hearing that he left work for work-related reasons, since this is belied by his employer's record, also militates against significant credibility.

Tr. 26-27.  These are valid reasons for discounting plaintiff's credibility and are supported by the evidence in the record (Tr. 80-81, 124-25). See Smolen, 80 F.3d at 1284 (ALJ may consider claimant's work record, prior inconsistent statements concerning symptoms, and testimony that appears less than candid).

In addition, the ALJ found that plaintiff's activities of daily living, including reading, watching television, doing computer work, handling his own finances, and driving constituted further evidence of his ability to concentrate. Tr. 27.  Plaintiff argues such activities were only intermittent in nature.  In particular, plaintiff argues that none of his activities involved handling his own finances.  However, at least one of the examining psychologists in the record noted that plaintiff did not appear to have any difficulty handling his own money. Tr. 256-57.  Further, while plaintiff argues he never drives alone, he reported that he could drive 80 to 100 miles at a time. Tr. 117.  In any event, even if plaintiff does engage in the above activities on an intermittent basis (although plaintiff has pointed to nothing in the record to indicate that this is so), as discussed above, the medical evidence in the record belies his allegation of concentration difficulties.

Finally, the ALJ discounted plaintiff's credibility in part for the following reason:

"[T]here is evidence that the claimant was awarded VA disability benefits, and according to Dr. Rubin this was a primary focus of contacts with providers.  Motivation and issue of secondary gain must be considered in assessing credibility.

Tr. 27.  The undersigned agrees with plaintiff that this is insufficient to support a finding of secondary gain. Nevertheless, the mere fact that one reason for discrediting plaintiff's testimony is not legitimate, does not render the ALJ's credibility determination invalid, as long as it is supported by the substantial evidence, as it is here as discussed above. Tonapetyan, 242 F.3d at 1148.

V.     The ALJ Properly Evaluated the Statement of Plaintiff's Mother

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  An ALJ may discount lay

1393, 1395 (9th Cir. 1984) . In rejecting lay testimony, the ALJ need not cite the specific record as long as

testimony if it conflicts with the medical evidence. Id.; Vincent on Behalf of Vincent v. Heckler, 739 F.3d

1393, 1395 (9th Cir. 1984) .  In rejecting lay testimony, the ALJ need not cite the specific record as long as

"arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly

link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236

F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at

642.

>    The ALJ discounted the statement of plaintiff's mother for the following reasons:

> The claimant's mother's statements indicate that the claimant becomes confused and has
> difficulty paying attention.  He has difficulties with his activities of daily living (Exhibit
> 5E).  Although the witness' statements generally are corroborative of the claimant's
> allegations, and have been duly considered, the close relationship between the witness
> and the claimant and the general nature of the statements must be considered.  I do not
> accord significant weight to these statements.  I am unable to credit this lay testimony in
> this matter as probative in terms of the ultimate issue of disability in light of the medical
> and other factors of this case.

Tr. 28.  Plaintiff argues these are not "germane" reasons for discounting the testimony of plaintiff's mother.

The undersigned agrees it was improper for the ALJ to discount this testimony based on the relationship

between plaintiff and his mother. See Smolen, 80 F.3d at 1288 (requiring consideration of testimony of

claimant's friends and family members).  The undersigned also finds questionable the ALJ's reference to the

"general nature" of plaintiff's mother's statements without some further explanation of how that makes

those statements less credible.

     On the other hand, the ALJ did properly note that plaintiff's mother's statements were inconsistent

with the medical evidence in the record. See Vincent, 739 F.2d at 1395 (proper for ALJ to discount lay

testimony that conflicts with available medical evidence).  Plaintiff argues that such testimony should be

credited as true, not because they are probative with respect to the ultimate issue of disability, but because

they are corroborative of plaintiff's allegations.  However, plaintiff is alleging that his impairments make him

unable to work, and thus disabled.  In addition, even if plaintiff's mother's statements do corroborate

plaintiff's testimony, as discussed above, the ALJ did not err in discounting that testimony.  Accordingly,

the ALJ did not err in also discounting the testimony of plaintiff's mother.

VI.   The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

     If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must

identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for

work-related activities." SSR 96-8p.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work. <u>Id.</u> at *2.  It is what the claimant "can still do despite his or her limitations." <u>Id.</u>

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." <u>Id.</u> at *7.

The ALJ assessed plaintiff with the following residual functional capacity:

> The claimant has the residual functional capacity to remember and execute simple instructions, sustain concentration on simple repetitive tasks and follow directions.  He should also not have close frequent interpersonal interaction with the general public.  The claimant has no exertional limitations.

Tr. 29, 31.  Plaintiff argues the ALJ erred in assessing his residual functional capacity because of his failure: (1) to give great weight to the VA determination of individual unemployability; (2) to factor in plaintiff's diagnosed somatoform disorder; (3) to factor in any limitations from plaintiff's headaches; and (4) his failure to properly factor in testimonial evidence from plaintiff and his mother.  As discussed above, however, the ALJ did not err with respect to any of these issues.  Accordingly, the ALJ also did not err in assessing plaintiff with the residual functional capacity that he did.

VII.   <u>The ALJ Erred in Finding Plaintiff Capable of Performing His Past Relevant Work</u>

If at step three, the ALJ determines that the claimant does not meet or equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, at step four, the ALJ next must determine whether the claimant can do his or her past relevant work based on his or her residual functional capacity. 20 C.F.R. § 404.1520(d), (e).  The ALJ found plaintiff capable of returning to his past relevant work, explaining his findings as follows:

> The evidence in this case establishes that the claimant has past relevant work as care provider and carpenter.  The claimant described his job as care provider as requiring helping mentally impaired individuals convicted of felony charges readjust to normal living.  He helps his clients with job searches and setting up bank accounts as well as helping them with housework (Exhibit 2E, testimony).  The claimant described his job as

carpenter as requiring using machines, tools and technical knowledge for framing and buildings (Exhibit 2E).

I do not find that the claimant's social limitations effect his ability to perform his work as home health care provider, as there has been no indication of any significant change in his mental status over time as set out more fully above.  Accordingly, based upon the residual functional capacity, the claimant could return to his past relevant work as carpenter and care provider.  The evidence indicates the claimant could return to this occupation as performed by the claimant.  For all the foregoing reasons I conclude that Mr. Glossbrenner retains the residual functional capacity to return to past work.

Tr. 30.  Plaintiff argues, however, that the ALJ's residual functional capacity assessment, which limits him to performing simple, repetitive tasks, precludes him from being able to perform either the care provider or the carpenter job.  The undersigned agrees.

It is true, as defendant contends, that because he found plaintiff could perform his past relevant work as plaintiff actually performed it, the ALJ was not required to address plaintiff's ability to perform that work as defined by the Dictionary of Occupational Titles ("DOT").  The ALJ did find, however, that plaintiff's work as a care provider required him to help his clients with job searches and setting up bank accounts.  Similarly, the ALJ noted that plaintiff's carpenter job involved using machines, tools and technical knowledge for framing and buildings.  It is clear that such job tasks require more than the ability to perform simple, repetitive tasks.

VIII.   The ALJ Was Not Required to Obtain the Testimony of a Vocational Expert

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).  The Grids may be used if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in the original).  That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in the original).  If the claimant "has significant non-exertional impairments," however, reliance on the Grids is not appropriate. Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).

Here, because the ALJ found plaintiff able to perform his past relevant work, he did not proceed on

1   to step five of the disability evaluation process to determine whether plaintiff could do other jobs existing in

2   significant numbers in the national economy.  Plaintiff argues, however, that the ALJ should have called a

3   vocational expert to testify at step five, in light of the ALJ's findings regarding his mental impairments and

4   because of his limitations from his migraine headaches and somatoform disorder.

5        While it is true, as discussed above, that the ALJ erred in finding plaintiff capable of performing his

6   past relevant work, and thus the Commissioner now is required to proceed on to step five, this does not

7   mean the Commissioner is required to obtain the testimony of a vocational expert on remand.  Indeed, also

8   as discussed above, the ALJ did not err in finding plaintiff's migraine headaches and somatoform disorder to

9   be non-severe.  In addition, although the ALJ did find plaintiff had certain mental functional limitations, it is

10  not clear from the record that those are the kind of "significant non-exertional impairments" that would

11  make reliance on the Grids improper. Ostenbrock, 240 F.3d at 1162.  In any event, it is not appropriate for

12  the court to make that determination at this time.  If on remand, however, the Commissioner determines

13  that vocational expert testimony is needed, such testimony shall be obtained.

14  IX.    This Case Should Be Remanded for Further Administrative Proceedings

15       The court may remand a case "either for additional evidence and findings or to award benefits."

16  Smolen, 80 F.3d at 1292.  Benefits may be awarded where "the record has been fully developed" and

17  "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d

18  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

19           (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
             evidence, (2) there are no outstanding issues that must be resolved before a
20           determination of disability can be made, and (3) it is clear from the record that the ALJ
             would be required to find the claimant disabled were such evidence credited.
21
22  Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

23  issues remain as to whether plaintiff can perform other jobs existing in significant numbers in the national

24  economy, this matter should be remanded to the Commissioner for further administrative proceedings.

                                        CONCLUSION

25       Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

26  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

27  further administrative proceedings.

28       Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

REPORT AND RECOMMENDATION
Page - 17

the parties shall have ten (10) days from service of this Report and Recommendation to file written

objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 24, 2005**, as

noted in the caption.

        DATED this 27th day of May, 2005.


                                        /s/ Karen L. Strombom
                                        Karen L. Strombom
                                        United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 18